**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| MADISON ONE HOLDINGS, LLC, BOUMATIC, LLC and KOTTS CAPITAL HOLDINGS, LP, | } } } |
| | }   Civil Case No. 4:06-cv-3560 |
| *Plaintiffs*, | } } |
| v. | } } |
| PUNCH INTERNATIONAL, NV and GUIDO DUMAREY, | } } |
| | } } |
| *Defendants*. | } |

## <u>OPINION AND ORDER</u>

Presently before the Court are Defendants Punch International, NV's (Punch) and Guido Dumarey's (Dumarey) (collectively, Defendants) summary judgment motion (Doc. 64); Plaintiffs Madison One Holdings, LLC's (Madison One), BouMatic, LLC's (BouMatic), and Kotts Capital Holdings, LP's (Kotts Capital) (collectively, Plaintiffs) motion to strike Defendants' summary judgment evidence (Doc. 71); Defendants' motion to strike Plaintiffs' summary judgment evidence (Doc. 79); Defendants' motion for leave to file supplemental material (Doc. 80); Plaintiffs' motion for leave to file a surreply (Doc. 93); and Defendants' objections to Magistrate Judge Frances Stacy's (Judge Stacy) August 27, 2008, Order (Doc. 94).

Upon review and consideration of these documents, the responses and replies thereto, the entire record in this cause, and the relevant legal authority, the Court finds that Defendants' motion for summary judgment should be granted; the parties' respective motions to strike summary judgment evidence should be granted-in-part and denied-in-part as set forth herein; the motions for leave to file supplemental material and a surreply should be granted; and the objections to Judge Stacy's Order should be sustained and her Order vacated.

I.          Background and Relevant Facts

A.          Kotts Acquires BouMatic in 2002

John Kotts (Kotts) has owned BouMatic since 2002.[1]  (Kotts Dep., Doc. 70 Ex. 1 at 6).  Kotts became interested in BouMatic because it had a very strong dealer base, a very substantial product, and was the largest and most well-known United States manufacturer of dairy farm equipment.  (*Id.* at 9).  Kotts' acquisition team, led by William Coe (Coe), helped Kotts analyze BouMatic's business and decide whether to acquire it.[2]  (Kotts Dep., Doc. 64 Tab 26 at 18).  Coe, the acquisition team CPA, is one of Kotts' "very trusted advisors."  (*Id.*; Coe (I) Dep., Doc. 64 Tab 22 at 10).  Coe worked for Ernst & Young from 1969 until 1995 and retired as a partner.  (Coe (I) Dep., Doc. 64 Tab 22 at 10).  He describes himself as knowledgeable about the issues involved in buying and selling a business.  (*Id.* at 14).

Kotts' acquisition team investigated BouMatic for approximately six months before Kotts actually purchased it.  (Kotts Dep., Doc. 64 Tab 26 at 16-17).  From the day they began looking at BouMatic until the day the deal closed, the acquisition team was consistently in due diligence mode, which included reviewing BouMatic's financial records, interviewing its management, visiting installations and dairies to gain an understanding of what its business entailed, and making an assessment of its product offering in the marketplace.  (*Id.* at 10, 17, 20-21).  Additionally, the acquisition team confirmed the representations and warranties made to them by representatives of BouMatic.  (*Id.* at 22).  As Kotts testified, ". . . we fundamentally believe people, but we always like to verify what they tell us wherever possible."  (*Id.* at 23).

---

[1] BouMatic is wholly owned by Plaintiff Madison One, and Plaintiff Madison One is wholly owned by Plaintiff Kotts Capital.  (Pls.' Orig. Pet., Doc. 1 Ex. C at ¶ 2).  Kotts, a Houston businessman, owns and controls Kotts Capital and all of the businesses that Kotts Capital owns.  (*Id.*).

[2] Kotts has an acquisition team with a certified public accountant (CPA), an investment banker, and an attorney.  (Coe (I) Dep., Doc. 64 Tab 22 at 34).  This team manages and oversees acquisition activities, prepares agreements, conducts due diligence, and analyzes financial issues.  (*Id.*).

B.     The State of Affairs at Prolion in the Spring and Summer of 2004

Prolion Holdings, NV (Prolion), a Dutch milking equipment company, manufactured robotic milking machine equipment, and it owned Gascoigne Mellotte (GM), which sold conventional milking machine equipment to dairy farms.  (Coe (I) Dep., Doc. 64 Tab 22 at 48; Dumarey Dep., Doc. 70 Ex. 3 at 76; Krueze Decl., Doc. 70 Ex. 4 at ¶ 4).  VSP, a close corporation owned by Dumarey and two other individuals, was Prolion's major creditor until June 2004 at which time Blitz Blauw, a wholly-owned subsidiary of Punch, purchased Prolion's debt in exchange for 186,000 shares of Punch.  (Dumarey Dep., Doc. 64 Tab 25 at 155; D'Hauw Dep., Doc. 64 Tab 24 at 55-56).

As the June 15, 2004, press release states, "Punch  is convinced of the potential of Prolion's technology and therefore wants to offer the company a chance of success within the structure of the Punch group . . . This will enable Punch to apply its approach and strategy, which have proven to be successful for other companies with promising technology, to Prolion's reorganization."  (Doc. 64 Tab 15).

As a condition precedent to the agreement, Punch requested control over the daily operations and management of Prolion. (Doc. 64 Tab. 16). As such, Prolion Chief Executive Officer (CEO) Bernard Vandekerckhove (Vandekerckhove) and Chief Operations Officer (COO) Joost Dessing (Dessing) resigned, and Marc Maes (Maes) became interim CEO.  (*Id.*).

C.     Kotts Wishes to Expand BouMatic's Presence in Europe

1.     Meeting with Prolion Executives in the Spring of 2003

After acquiring BouMatic, Kotts decided that he needed to expand the company's presence in Europe.  (Coe (I) Dep., Doc. 64 Tab 22 at 46).  As a result, he asked Maury Bell (Bell), an investment banker who provides Kotts with consulting services on acquisitions, to

review the industry in Europe and identify potential acquisition opportunities.  (*Id.* at 46, 48-49).  One of the companies that Bell identified was Prolion.  (*Id.* at 48).  Accordingly, in the Spring of 2003, Kotts met with Vandekerckhove and Dessing.  (Coe (I) Dep., Doc. 64 Tab 22 at 48-49).

Before meeting with Vandekerckhove and Dessing, Kotts gathered some background information.  He knew that Prolion was a public company that published its financial statements.  (Kotts Dep., Doc. 64 Tab 26 at 30).  Coe researched and found financial statements for Prolion, but they were in a foreign language. (*Id.* at 57).  Kotts was not at the point in his negotiations with the Prolion executives that would have warranted the expense of translating the financial statements into English.  (*Id.*).  When asked when, during the negotiation process, Kotts would incur the expense of translating financial statements, he stated, "[w]hen we would have an opportunity if we were doing some form of transaction to, to actually engage in a full due diligence."  (*Id.* at 59).  Kotts acknowledged that he could have the financial statements translated without engaging in full due diligence.  (*Id.*).

Prior to the meeting, in the spirit of learning more about the competition, Kotts spoke to the BouMatic salespeople, engineers, and dealers.  (*Id.* at 37).  His engineers advised him that GM had some very good products, as well as a good market position, but that BouMatic had a better product.  (*Id.* at 37-38).  With respect to the GM conventional product, the BouMatic salespeople told Kotts that GM had "a good, well-established dealer base, and, and they had some good low-end and medium-end product."  (*Id.* at 38).  From these discussions, Kotts believed that GM had "a well-established brand, it had a well-established dealer base, and it had generally a, you know, reliable product."  (*Id.*).

After Kotts' initial meeting with Vandekerckhove and Dessing in the Spring of 2003, he drew certain conclusions about Prolion's financial health.  (*Id.* at 48).  First, he had the

sense that "the robotics business was consuming cash at a somewhat alarming rate" but that "the conventional business was perking along just fine." (*Id.*).  Additionally, he got the impression from Vandekerckhove and Dessing that the conventional business got the bare minimum that it needed to survive for inventory and working capital.  (*Id.*).  This initial meeting and the research done in preparation for it did not lead to any further discussions.  (*Id.* at 61).

2.    June 2004 Conversations with Dumarey

In June 2004, Dumarey contacted Kotts about a potential business transaction between BouMatic and Prolion.  (*Id.* at 63).  The following day, the two men met for coffee in Amsterdam.  (*Id.* at 64-65).  Their meeting lasted approximately twenty or thirty minutes.  (*Id.* at 65).  During the meeting, Dumarey told Kotts that he held significant debt in Prolion and that these debt holdings gave him control over the company.  (*Id.* at 67).  He further stated that Prolion was "a great business, but he was sick and tired of it and he wanted, he wanted to get out of it."  (*Id.* at 69).  Kotts told Dumarey that he would only do an asset deal.  (Dumarey Dep., Doc. 64 Tab 25 at 82).  Specifically, Kotts spoke about the value of goodwill and that it was his only interest.  (*Id.*).  Kotts told Dumarey to contact him when Kotts was back in Texas.  (Kotts Dep., Doc. 64 Tab 26 at 82).

Dumarey subsequently telephoned Kotts in an attempt to negotiate a deal.  (*Id.* at 71).  Kotts was only interested in the conventional milking equipment business, not the robotics business, of Prolion.  (*Id.* at 74, 132).  During the telephone conversation between Dumarey and Kotts, Kotts alleges that Dumarey made the following statements:

The GM inventory was "all good.  That it was all salable.  There was no bad inventory." (*Id.* at 74-75).

"[T]here were no bad receivables." (*Id.* at 75).

The dealers "were good, and the relationships with the dealers were excellent" and "the dealer network was in, was in good shape.  That it was – I think he used the word excellent."  (*Id.* at 75, 80).

"[T]he dairy farmers loved the product" and "that the product line was excellent, that the dealers loved it, that, that the dairy – that the farmers loved it, that they had a great product."  (*Id.* at 75, 89).

"[T]he company was profitable" and "was making two million [euros] a month in revenues."  (*Id.* at 75, 89).

"The company "made a minimum 50 percent net – or gross margin."  (*Id.* at 75).

"[H]e would do whatever it took to make [the transaction] work smoothly."  (*Id.* at 72).

According to Kotts' testimony, the essence of the agreement between him and Dumarey was that BouMatic would "purchase the business . . . pay for the goodwill of the business . . . pay five million euros . . . pay for the receivables as they were collected . . . pay for the inventory as the inventory was used . . . pay the price of the inventory, what is structured by that 50 percent calculation."  (*Id.* at 79).  As a result, Dumarey approached Prolion's board in his capacity as a creditor and suggested that Prolion sell the conventional milking equipment business' assets to BouMatic with twenty percent of the proceeds going to the creditors and the rest to Prolion itself. (Dumarey Dep., Doc. 64 Tab 25 at 83).  Although the Prolion board did not initially find the deal "so interesting," it eventually decided to approve it and enter into negotiations with BouMatic. (*Id.* at 142, 145-46).

Kotts was primarily interested in obtaining GM's dealer network, inventory, and brand.  (Kotts Dep., Doc. 64 Tab 26 at 74).  As Kotts testified, although BouMatic was very strong in France, it "did not have particularly good representation in Belgium or the Netherlands or in other parts of Europe.  [GM] had a very nicely diversified dealer network throughout the

balance of Europe." (*Id.* at 80).  BouMatic's acquisition of GM would give it a "much expanded footprint," and that, "more than anything else, is . . . why [Kotts] thought [BouMatic] should proceed with the transaction." (*Id.* at 80-81).  Kotts did express two concerns with respect to the transaction.  First, his largest concern was that information about Prolion's conventional and robotic businesses were in one computer system and that both businesses were being run out of a single facility in Belgium, which would make it difficult to separate the two.  (*Id.* at 72-73). Additionally, as Kotts testified, he was "concerned . . . that [he] could trust this man [Dumarey] and . . . that he would live up to his word that he would make this work." (*Id.* at 73-74). Dumarey insisted that "whatever it took, that he would provide all the resources, computer resources, personnel resources, and provide whatever support I needed to sort . . . whatever it took, six months or a year, to sort of separate those two organizations." (*Id.*).  Accordingly, after his telephone conversation with Dumarey, Kotts gave Coe the skeleton of the transaction described above and instructed him to begin working on the transaction documents.  (*Id.* at 91).

### 3.    BouMatic's Preliminary Investigation

Defendants cite to information that Plaintiffs had prior to entering into the Asset Purchase Agreement (APA).  First, the January 30, 2004, Press Release entitled "Prolion Reaches Agreement with VSP Regarding a Rescheduling of the Debt Portfolio" reported that, during October 2003, credit facilities to "the Prolion/GM" group for 8.8 million euros had been restructured.  (Doc. 64 Tab 10).  As a result, the loans would not carry interest during the 2003 calendar year and capital reimbursements would be postponed for six months.    (*Id.*). Additionally, the press release stated that the loans were "recently" restructured again to delay the repayment of principal until December 2007 and that VSP would provide a "stand-by facility" during the next 18 months to "overcome temporary liquidity shortages."    (*Id.*).

Furthermore, the press release reported that Prolion's half-year results failed to reach its EBITDA targets and that one of the most important reasons for this failure was the "strong reduction of the inventory level in the supply chain as a consequence of liquidity problems, which on their turn caused an important backlog in deliveries." *Id.* As Coe concluded at his deposition, this information indicates that the company was "unable to make the debt service payments required" under the terms of its loans and that it was "not doing too well." (Coe (I) Dep., Doc. 64 Tab 22 at 121-22, 138-39).

Additionally, Kotts asked Anthony Alaimo (Alaimo) to travel to Europe to review GM's operations, interview its personnel, and attempt to understand the logistics that would be necessary to complete the transaction. (Kotts Dep., Doc. 64 Tab 26 at 129-30). Specifically, Kotts requested that Alaimo ensure that "the inventory is good, the receivables are good, that there's good employees, that there's a good dealer base, and that this company is, in fact, making – doing 25 million euros a year, and is, in fact, profitable." (*Id.* at 133). Kotts testified that he would have expected Alaimo to obtain public financial statements and press releases concerning Prolion to the extent they were available. (*Id.* at 161).

In accordance with Kotts' instructions, Alaimo met with members of Prolion's management. (Alaimo Dep., Doc. 64 Tab 21 at 35). During the course of the meeting, Alaimo asked if he could see a financial statement, a customer list, a list of volume by region or by dealer, an aged accounts receivable, an aged accounts payable, an organization chart, among other things. Prolion, however, denied Alaimo's requests with the exception of providing him with "a couple of documents." (*Id.* at 36). Alaimo concluded that it would be a good idea to move forward with the transaction because "it fit with the strategy" of BouMatic at that time. (*Id.* at 45). As Alaimo testified, "[i]n the milking machine business you have to get to a certain

size before you can make a good amount of money.  And so BouMatic had to get bigger."  (*Id.*).
If GM and BouMatic were merged together properly, this would create "a better structural
situation relative to the rest of the people in the industry."  (*Id.*).  According to Kotts, Alaimo
advised him that the acquisition of GM was a "very promising and attractive transaction" and
that it was something BouMatic should pursue.  (Kotts Dep., Doc. 64 Tab 26 at 133).

   Guy Pochard (Pochard), the head of BouMatic's European marketing operations,
went with Alaimo to meet with members of Prolion's management.  (*Id.* at 130-31).  Pochard
subsequently emailed Bell about the meeting and other information he had learned about GM.
The email states, in pertinent part,

> The new management team is planning to make drastic changes.  It
> is very likely that the decisions will be mainly driven by the need
> to reduce immediately expenses.  Such actions could be very
> damaging to the business since it is doubtful that the new
> management team [h]as a good grasp of the business.
>
> It is my understanding that the Dealers are going through [a] very
> difficult time trying to get products delivered and at this time it is
> difficult to appreciate the long term impact on the business.
> Visiting with all the key dealers will have to be part of the due
> [d]iligence and we will need to get assurances from the Dealers of
> their intention to continue to do business with the new entity.
>
> We could not get a clear answer regarding the Dealer Agreement
> in place between GM and the Dealers, we will have to review such
> contracts in order to make sure that we can live with it.  If we
> purchase assets the contract will be likely part of the assets
> acquired.
>
> We learned that one key supplier Geminus (electronic equipment)
> was not delivering in time and had quality problems.

(Doc. 64 Tab 14).  On July 6, 2004, Alaimo forwarded Pochard's email, in addition to his own
report on what he learned during the meeting with Prolion's management, to Kotts, Bell, Pochard
and Coe.  (*Id.*).  One of the comments Alaimo made in his email is that the Prolion management

indicated that GM has a "a 50% margin AFTER the new prices come out (10-12% increase)" but that there is a question as to whether the new prices would be accepted in the market.  (*Id.*).

4.    <u>The Asset Purchase Agreement</u>

In early July 2004, Prolion and BouMatic began working on a Memorandum of Understanding (MOU) to outline the terms of the transaction.  (Coe Aff., Doc. 70 Ex. 5 at ¶ 4).  Initially, the parties intended on preparing a Memorandum of Understanding followed by the definitive Asset Purchase Agreement (APA).  (Coe (I) Dep., Doc. 64 Tab 22 at 197).  According to Coe's testimony, "we couldn't agree on the language of the [MOU] and it became apparent to all the parties concerned that if we were going to have an APA by the 15th of July, you [k]now, we were going to have to do an APA and not do the more traditional approach."  (*Id.*).

Steve Weiss (Weiss), the attorney on Kotts' acquisition team, emailed a revised draft of the MOU to Maes which included the following due diligence provision:

> In connection with the proposed Transaction (as defined in Article 4 below), PROLION shall give full and complete access during normal business hours to BOUMATIC, and those persons authorised by it, to the premises of PROLION and all such Intellectual Property, contracts, agreement[s], documents and related Contract Rights, Business Data, financial statements, work papers, financial records, title deeds, books, Receivables, Stock records and extracts thereof relating to the G&M Business, as BOUMATIC reasonabl[y] deems necessary in order to conduct a thorough business, financial and legal due diligence investigation in order to proceed to Closing.

(Doc. 64 Tab 19).  The Kotts acquisition team included this provision in the MOU because it is "something he [Kotts] would normally expect" the team to do.  (Coe (I) Dep., Doc. 64 Tab 22 at 72).  Eventually, however, the parties realized they would either have to delay the transaction date or forego due diligence so that the transaction would close on schedule.  (*Id.* at 73).  Coe became concerned once he realized the acquisition team would not have time to conduct due

diligence as was its normal practice.  (*Id.* at 74).  Coe expressed his concerns to Kotts.  (*Id.*).

Kotts decided "that given the nature of the transaction, given the fact [he] thought it was a, a nice

fit for BouMatic, that [he] would proceed based on the promises and the commitments that Mr.

Dumarey had made, and [he] would do so on the basis of what [he] would call extraordinarily

rigorous representations and warranties."  (Kotts Dep., Doc. 64 Tab 26 at 124).  Kotts admits,

however, that he and Dumarey never specifically discussed the concept of representations and

warranties.  (*Id.* at 126-27).

The parties executed the APA on July 14, 2004, two days after Weiss circulated

the first draft for Prolion's review.  (Coe (II) Dep., Doc. 64 Tab 23 at 28; Doc. 64 Tab 17).  Maes

signed for Prolion, and Coe signed for BouMatic.  (Doc. 64 Tab 17).  The APA included the

following representations:

> "None of the Sellers or the G&M Business has . . . delayed or
> postponed the payment of any accounts payable or accrued
> expense outside of the ordinary course of the G&M business."
> (Doc. 64 Tab 17 at 3(h)(iii)).[3]
>
> "[N]one of the Sellers" have knowledge of any of the "dealers,
> distributors or customers" representing "more than one (1%)
> percent of the consolidated revenues of the G&M business" who
> are planning to "materially reduce" or "discontinue" purchasing
> products and services from G&M.  (*Id.* at 3(h)(ix)).
>
> "None" of GM's inventory is "obsolete, damaged, or defective[.]"
> (*Id.* at 3(n)).
>
> "All" of GM's receivables are "valid" and "subject to no setoffs or
> counterclaims" and are "current and collectible[.]"  (*Id.* at 3(p)).
>
> "Each product" is "in conformity with all applicable contractual
> commitments and all express and implied warranties[.]" (*Id.* at
> 3(s)).

---

[3] The Court notes that G&M and GM are one and the same.  The parties used the short-form G&M in the
text of the APA, while the Court uses GM as the short-form in this Opinion and Order.

> "[T]he purchase price for the Closing Date Stock . . . shall be calculated on the basis of the following formula . . . Stock purchase price = fifty percent (50%) of the "Net Dealer Price[.]"  (*Id.* at 2(c)(iii)).

> "Each of the Parties will use its commercially reasonable best efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement[.]"  (*Id.* at 5(a)).

As it states in the APA, Prolion would provide BouMatic with disclosure schedules, which include exceptions to the representations and warranties in the APA, no later than July 21, 2004. (Coe (I) Dep., Doc. 64 Tab 22 at 207-08).  The front page of the disclosure schedules states "that all information that is public or available for public consultation as well as all information in the APA is disclosed."  (Doc. 64 Tab 18).  After the transaction closed, Plaintiffs learned that, contrary to the representations and warranties allegedly made by Dumarey and included in the APA, there were various problems at GM with respect to its dealers, inventory, product line, receivables, among others.

### D.    Procedural Background

On October 11, 2006, Plaintiffs filed a fraud, fraudulent inducement, and conspiracy action against Defendants in the 215th Judicial District Court of Harris County, Texas (Cause No. 2006-65144).  (Pls.' Orig. Pet., Doc. 1 Ex. C).  Defendants removed the action to this court on November 9, 2006.  (Doc. 1).  Defendants filed a summary judgment motion arguing that it is undisputed that (1) Dumarey's statements to Kotts in June 2004 were not fraudulent; (2) Dumarey and Punch did not make and were not aware of representations and warranties Prolion made to BouMatic in the APA; and (3) Plaintiffs did not enter the APA in reliance on either Dumarey's statements or the representations and warranties.  Plaintiffs argue otherwise.

II.              Legal Standard on Summary Judgment

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).  The substantive law governing the suit identifies the essential elements of the claims at issue and, therefore, indicates which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Once the movant meets its burden, however, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 323-24.   The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor.  *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).   To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v.*

*Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir. 1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence.  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994);  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992).  Nor are pleadings summary judgment evidence.  *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075).  The non-movant cannot discharge his burden by offering vague allegations and legal conclusions.  *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990).  Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins*, Inc., 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party.  *Matsushita*, 475 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party.  *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).  The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue.  *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).   In reviewing evidence favorable to the party opposing a motion for

summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form.  *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir. 1988).

III.        Discussion

        A.        Evidentiary Objections

        Before it addresses the merits of Plaintiffs' fraud, fraudulent inducement, and civil conspiracy claims, the Court shall rule on the parties' respective objections to the summary judgment evidence.

        Fed. R. Civ. P. 56(e) states, in pertinent part,

        A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed. R. Civ. P. 56(e).  In the Fifth Circuit, it is well settled that "the admissibility of summary judgment evidence is subject to the same rules of admissibility applicable to a trial."  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004) (quoting *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1024 (5th Cir. 1995)).

                1.        Plaintiffs' Objections to Defendants' Summary Judgment Evidence

        Plaintiffs argue that exhibits 10, 11, and 12 were not properly authenticated and that the English translations of these documents were not certified.  Additionally, Plaintiffs assert that exhibits 13, 15, and 16 were not properly authenticated.  Plaintiffs also object to documents attached to Maes' executed declaration filed on June 30, 2008, as untimely and improperly authenticated.

Fed. R. Evid. 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  The proponent does not have to rule out all possibilities not consistent with authenticity; the standard is one of "reasonable likelihood."  *United States v. Alicea-Cardoza*, 132 F.3d 1, 4, 5 (1st Cir.1994).   To authenticate documents used to support a motion, a party must attach the documents as exhibits to an affidavit made by a person through whom the exhibits could be admitted into evidence at trial.  *Orr v. Bank of America NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).   To authenticate by affidavit, an affiant must affirmatively show that he has personal knowledge and "is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  The parties may also authenticate exhibits with deposition excerpts as long as these excerpts are accompanied by the court reporter's certification that the copy is true and correct.  *Refrigeracion Y Restaurante S.A. De C.V. v. Wal-Mart Stores, Inc.*, No. Civ. A. SA97CA354EP, 1998 WL 1782541, at *1 (W.D.Tex. July 21, 1998).

Exhibit 10 is a January 30, 2004, Prolion press release in English.  Therefore, no translation certification is required.  As for Plaintiffs' authentication objection, as Defendants point out in their response, this document was authenticated by the deposition testimony of Prolion Chief Executive Officer Johann D'Hauw (D'Hauw).  *See* Defs.' Reply, Doc. 81 Tab 36 at 79.   Plaintiffs argue that this excerpt is defective because it lacks a court reporter's certification that the copy is true and correct.  Because Defendants provided a certification with the D'Hauw deposition excerpts attached as exhibits to the summary judgment motion, the Court is going to view Defendants' failure to do so here as an oversight.  This objection is overruled.

Exhibits 11 and 12, dated February 12, 2004, and May 13, 2004, respectively, are Prolion press releases in Flemish with English translations. Defendants have provided an Affidavit of Accuracy from Svetlana Saitsky for each press release translation. *See* Defs.' Reply, Doc. 81 Tabs 11(A) and 12(A). They failed, however, to properly authenticate the press releases. As such, the Court will sustain Plaintiffs' objections to and strike exhibits 11 and 12.

Exhibit 13 is an "Assessment of the Gascoigne Melotte Dairy Technology Equipment" written by Nelson on July 8, 2004. BouMatic may have produced this document during discovery; however, Defendants have failed to provide the Court with an affidavit or testimony from a witness with personal knowledge of the document's authenticity or validity. Accordingly, the Court must sustain Plaintiffs' objection to and strike exhibit 13.

Exhibits 15 and 16 are Punch press releases dated June 15, 2004, and June 25, 2004, respectively. These documents have not been authenticated by affidavit or deposition testimony. However, there are circumstantial factors that indicate their authenticity. In *Perez v. Alcoa Fujikura, Ltd.*, 969 F. Supp. 991, 998 (W.D.Tex. 1997), the documents in question were dated and contained the company logo, pre-printed address, and telephone number, all of which the Court found showed authenticity. *Id.* at 998 (citing *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 293 (3d Cir. 1983) (firm logo helps establish authenticity of memoranda); *Federal Trade Comm'n v. Hughes*, 710 F. Supp. 1520, 1522-23 (N.D.Tex. 1989) (documents provided during discovery, on defendant's letterhead, held authentic under 901(b)(4)); *New Orleans Saints v. Griesedieck*, 612 F. Supp. 59, 62 (E.D.La. 1985) (use of letterhead form demonstrates that form was made in course of regularly conducted business activity, thus authenticating it); Fed R. Evid. 901(b)(4) (characteristics and contents of document, taken in conjunction with circumstances, will authenticate it)). In the instant case, both of the press

releases contain Punch's logo, a reference to the "News Room" beneath the logo, and the web address and the date the web address was viewed at the bottom of the page. These facts, namely, that these press releases were printed directly from the web address, persuade the Court of the documents' authenticity. Thus, Plaintiffs' objections to these exhibits are overruled.

Plaintiffs also object to documents attached to Maes' executed declaration filed on June 30, 2008. Specifically, Plaintiffs object to an email from Vandekerckhove to Maes dated July 14, 2004, a certified translation of the email, and two marked-up drafts of the APA, which were attachments to the email. Although these documents were not originally attached to Maes' unexecuted declaration when it was first filed on June 13, 2008, the Court, in its discretion, will allow them. Defendants contend that Maes discovered, upon final review of the materials, that these documents were missing and, as such, produced them when he executed the declaration. Additionally, Plaintiffs contend that Defendants failed to properly authenticate the email attachments. The Court, however, disagrees. These documents were attachments to an email that was authenticated by Maes' declaration. Accordingly, Plaintiffs objections are overruled.

2.      Defendants' Objections to Plaintiffs' Summary Judgment Evidence

Defendants' make several objections to Plaintiffs' summary judgment evidence. Specifically, they object to portions of Evert Krueze's (Krueze) declaration, Coe's affidavit, Alaimo's affidavit, and Alaimo's deposition testimony on hearsay grounds. Additionally, Defendants assert that these individuals lack personal knowledge to testify about certain facts.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Unless covered within an exception, hearsay evidence is inadmissible. Fed. R. Evid. 802. The hearsay rule applies with equal force in the context of summary judgment evidence.

*See Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006) (noting that hearsay evidence is inadmissible for summary judgment purposes under Fed. R. Civ. P. 56).

Fed. R. Civ. P. 56(e) requires that opposing affidavits "be made on personal knowledge" and that they "show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). A district court may rely upon affidavits in the summary judgment context where the affiants' "personal knowledge and competence to testify are reasonably inferred from their positions and the nature of their participation in the matters to which they swore." *DIRECTTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) (quoting *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990)). As the Fifth Circuit has stated, "[a]n affiant . . . may have personal knowledge of activities in which she has not actually participated." *Hamilton v. Trover Solutions, Inc.*, No. 03-30547, 2004 WL 1491587, at *1 (5th Cir. 2004) (citing *Dalton v. FDIC*, 987 F.2d 1216, 1223 (5th Cir. 1993). For example, "a manager of an organization can glean personal knowledge of the practices of that organization by participating in those practices or reviewing the organization's records." *Id.* (citing *FDIC v. Patel*, 46 F.3d 482, 484 (5th Cir. 1995); *FDIC v. Selaiden Builders, Inc.*, 973 F.2d 1249, 1255 (5th Cir. 1992)).

a.     <u>Krueze's Declaration</u>

Defendants object to these statements in paragraph 6 of Krueze's declaration:

I consistently heard from customers that they wanted GM to develop new products. (Krueze Decl., Doc. 70 Ex. 4 at ¶ 6).

In 2002, I heard from GM marketing personnel such as Willem Smit and Ghislain Coppejans that customers found that GM's product line needed upgrading. (*Id.*).

Krueze's statement that "[he] consistently heard from customers that they wanted GM to develop new products" is based on the personal knowledge that he obtained visiting GM customers in the Netherlands, France, Germany, Belgium, and Italy in 2002. The Court does not consider this

statement hearsay but, rather, a conclusion based on Krueze's personal observations and impressions in 2002.  Thus, the Court will overrule Defendants' objection to this statement. Krueze's statement that he heard from GM marketing personnel that "customers found that GM's product line needed upgrading" is a hearsay statement based on his conversations with Willem Smit and Ghislain Coppejans.  Thus, the Court will sustain Defendants' objection to and strike this statement from the record.

Defendants object to the following in paragraph 8 of Krueze's declaration:

> . . . I heard from my colleagues that the [LactiVac] product was not working properly.  (*Id.* at ¶ 8).

Krueze worked as a technical field specialist providing support to GM customers and GM's research and development staff from 1995 to 2004.  (*Id.* at ¶ 2).  His job was to address problems with GM equipment that dealer technicians were unable to fix, and it required him to have a detailed understanding of how each GM product worked and to know of any new products in development.  (*Id.* at ¶ 3).  Although "[he] had less direct information about the LactiVac," the Court will infer Krueze's personal knowledge and competence to testify about this product from his position at GM and the nature of his participation in product performance and research and development.  Defendants' objection to this statement is overruled.

Defendants object to this statement in paragraph 9 of Krueze's declaration:

> Mr. Knip agreed with our assessment that the products were not ready for the market, but told us that Prolion's marketing department – namely, Willem Smit – insisted on releasing the products even though the products were not ready.  (*Id.* at ¶ 9).

The fact that the marketing department insisted on releasing the Condulac and LactiVac products prematurely falls outside of Krueze's personal knowledge.  Krueze learned this secondhand from Knip.  Accordingly, the Court sustains Defendants' objection to and strikes this statement.

In addition to objecting to Exhibit 1 of Krueze's declaration, which is referenced in paragraph 11, Defendants also object to the following statement in paragraph 11:

> . . . is a true and correct copy of a memo prepared by Jean-René Thibaut that I received in October 2003.  (*Id.* at ¶ 11).

Plaintiffs contend that this exhibit is admissible on at least four grounds: (1) as a present sense impression, (2) under the then-existing state of mind hearsay exception, (3) as a business record, and (4) under the residual hearsay exception.  While this memorandum is being offered to prove the truth of the statements allegedly made by third-party Italian customers, it falls under the records of regularly conducted activity exception to the hearsay rule.  Fed. R. Evid. 803(6) provides that the following records of regularly conducted activity are not excluded by the hearsay rule, even though the declarant is available as a witness:

> A memorandum . . . in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum . . . all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed. R. Evid. 803(6).  The memo at issue here was prepared shortly after Jean-René Thibaut (Thibaut), a GM employee, visited four Italian farms that use GM products.  Thibaut possesses the requisite knowledge to assess and document GM's product performance at these farms and to recount his communications with and observations about the Italian customers.  A memo that records the complaints and concerns of customers, like the one prepared by Thibaut, would be kept in the regular course of GM's business.  As such, the Court overrules Defendants' objection

to the statement in paragraph 11 of Krueze's declaration and to Thibaut's memo attached as exhibit A.

b.     <u>Coe's Affidavit</u>

Defendants object to paragraph 3 of Coe's affidavit, which states as follows:

> In late June or early July of 2004, Mr. Kotts was contacted by Guido Dumarey, the CEO of Punch International.  Mr. Dumarey apparently had control over GM due to the fact that he held a significant debt position in Prolion Holdings, NV, which was GM's parent company.  I understood that Mr. Dumarey wanted to move Prolion out of the conventional milking equipment business in order to focus on the robotic side of the business.  Robot equipment is expensive to develop but is less labor-intensive for the farmer than the conventional milking equipment sold by companies like BouMatic and GM.  Mr. Kotts was interested in the information he had received about GM from Mr. Dumarey, and I began working on transaction documents to memorialize the terms of the agreement that Mr. Kotts and Mr. Dumarey had reached. (Coe Aff., Tab 70 Ex. 5 at ¶ 3).

This paragraph describes a conversation between Kotts and Dumarey for which Coe was not present and speculates about Dumarey's reasons for moving from the conventional to the robotic side of the milking business.  Accordingly, the Court sustains Defendants' objection to and strikes this paragraph from the record with the exception of two statements.  First, the statement that "[r]obot equipment is expensive to develop but is less labor-intensive for the farmer than conventional milking equipment" is admissible because Coe has sufficient personal knowledge to make this statement based on his four years of experience in the milking industry.  Second, the statement that "[he] began working on transaction documents to memorialize the terms of the agreement that Mr. Kotts and Mr. Dumarey had reached" is admissible because it involves a specific job that he performed, that is working on the transaction documents.

Additionally, Defendants object to the following statements in paragraphs 14, 16, and 19 of Coe's affidavit on the grounds that Coe lacks personal knowledge:

> For example, immediately after the acquisition, we began receiving complaints about systematic defects in GM products. There were problems with the activity measurement system, which helps farmers determine breeding schedules and ensures a continuous supply of milk; the Condulac, a conductivity measurement device that looks for signs of mastitis, a common udder infection; and the LactiVac vacuum pump, which was the main vacuum pump sold by GM and a central component of any milking machine. Through discussions with our personnel in Remicourt, who were former Prolion employees, we learned that Prolion was aware of the product quality problems before the acquisition. In fact, there were a number of complaints from farmers and dealers on file at Prolion that dated to before the acquisition. (*Id.* at ¶ 14).

> By early August 2004, we also learned that Prolion had created serious problems with the GM supply base by failing to pay its bills on time. Between August and December 2004, I received emails and phone calls several times a week advising me about suppliers that were blocking shipments because of unpaid Prolion invoices. These blocked shipments made it difficult to fulfill customer orders, which was yet another source of dealer frustration with Prolion and later with BouMatic. (*Id.* at ¶ 16).

> When BouMatic attempted to collect these receivables a second time, it created ill will with our customers. (*Id.* at ¶ 19).

The Court has reviewed these statements, as well as the excerpts from Coe's deposition to which Plaintiffs and Defendants both cite. Coe testified that ". . . there was information that [he was] finding out from customers about receivables that were not reflected on Prolion's books and records." (Coe Dep. II, Doc. 91 Tab 1 at 50). Additionally, when asked if there were "other things that [he] discovered when talking to customers that were at odds with what was shown on Prolion's books and records," Coe responded that he thought "there were instances were invoices had been recorded as receivables and the goods had never been shipped." (*Id.*). Coe did not directly speak to the personnel in Remicourt or the customers regarding complaints about product quality because he was at a "very high level" and there were "operational people that were dealing – supervising on a daily basis." (*Id.* at 68-69). The Court finds that Coe's personal

knowledge and competence to testify may be reasonably inferred from his position as a high

level employee in charge of resolving customer complaints and collecting receivables.  As such,

Defendants' objections to paragraphs 14, 16, and 19 are overruled.[4]

Lastly, Defendants object to the following statement in paragraph 15 on hearsay

grounds:

> We discovered that Prolion had at least 608 incomplete orders
> outstanding at the time of the acquisition where Prolion had
> already invoiced its dealer customer for the entire shipment, even
> though the order was missing parts and was not complete.  (*Id.* at ¶
> 15).

This is not a written or oral statement made by an out-of-court declarant to prove the truth of the

matter asserted and, as such, is not hearsay.  It is a statement about how many incomplete orders

existed at the time of the acquisition that is within Coe's personal knowledge to make by virtue

of his position as a high level employee in charge of resolving customer complaints and

collecting receivables.  Accordingly, Defendants' objection is overruled.

c.      Alaimo's Affidavit

Defendants move to strike paragraphs 4 and 5 from the record on the ground that

the paragraphs refer to spreadsheets that were not attached to Alaimo's affidavit.  Additionally,

Defendants argue that the contents of the spreadsheets are hearsay.  Paragraphs 4 and 5 state,

> During the meeting, Mr. Maes informed me that GM had £25
> million in annual revenues, had offices and warehouses in nine
> countries, had approximately 220 employees, and earned a 50%
> gross profit margin on its products.  Mr. Maes provided me with
> two spreadsheets which I downloaded onto my laptop.  One
> spreadsheet, which showed sales turnover for the GM conventional
> equipment business, reflected that GM had realized over £23.8

---

[4] The Court notes that Defendants also object to paragraph 16 on hearsay grounds.  The Court, however,
finds that this objection should also be overruled.  Although this statement is being offered to prove the truth of the
matter asserted therein, it falls under a hearsay exception, specifically, Fed. R. Evid. 803(3).  This statement shows
the declarants', the suppliers in this case, then existing state of mind as to why they were blocking shipments.

million in conventional equipment turnover between June 2003 and May 2004, the last month for which Mr. Maes provided data. (Alaimo Aff., Doc. 70 Ex. 10 at ¶ 4).

The second spreadsheet showed the volume of products that Prolion had purchased from each of its suppliers in the past nine months. It showed that Prolion had 184 suppliers in its network and was spending about £15,515,177 annually on supplies. Some of that amount was for equipment used in Prolion's robotic milking equipment business. Given that milking equipment manufacturers typically have high materials costs and purchase products from a large number of suppliers, Prolion's supply costs did not appear abnormal in comparison to conventional equipment turnover. All in all, the information Mr. Maes provided to me revealed no abnormalities or problems with the GM business. (*Id.* at ¶ 5).

Although Plaintiffs fail to attach these two spreadsheets as exhibits to Alaimo's affidavit, the Court will allow his statements concerning them. As Plaintiffs assert and the Court confirms, the advisory notes to Fed. R. Civ. P. 56(e) state that the requirement "[i]f a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit" was added "to overcome a line of cases, chiefly in the Third Circuit, which ha[d] impaired the utility of the summary judgment device" by allowing parties to overcome summary judgment by referring to allegations in their pleadings. Fed. R. Civ. P. 56 advisory committee note. The fact that Plaintiffs have failed to supply the Court with these two spreadsheets will not affect the admissibility of Alaimo's statements but, rather, the weight and credibility.

As for Defendants' argument that the spreadsheets constitute inadmissible hearsay evidence, the Court disagrees. The Court agrees with Plaintiffs' contention that Alaimo's statements about the spreadsheets are admissible as admissions of a party-opponent pursuant to Fed. R. Evid. 802(d)(2)(B), which provides that a statement is not hearsay if:

The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the

> party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Fed. R. Evid. 802(d)(2)(B). Plaintiffs are offering these statements against Defendants, and these statements were made by Maes, an individual authorized by Defendants to make them. Thus, Defendants objections to paragraphs 4 and 5 are overruled.

Defendants also object to paragraph 7, which states as follows:

> For two weeks after my meeting in Belgium, negotiations with Mr. Dumarey and his representatives concerning the drafting of the transactional documents continued. I was not directly involved in those negotiations, but I was aware of their status. On July 14, 2004, the acquisition of the GM assets closed. Based on everything I knew, I believed that we were acquiring a well-functioning business with a satisfied dealer network, a fully functional product line, good relationships with its suppliers, and a respected brand name. Although I recall some talk about how Prolion's robotic business might have been experiencing some financial problems, I did not believe these problems in any way extended to or affected GM's conventional milking business. I understood the GM conventional business to be a well-performing, respected business that stood alone and was separate from the robotic business. (Alaimo Aff., Tab 70 Ex. 10 at ¶ 7).

Defendants argue that Alaimo lacks personal knowledge to make this statement and that it is hearsay. The Court disagrees. Alaimo, a consultant for BouMatic, attended the July 2, 2004, meeting in Belgium with Prolion's management team to learn more about GM. (*Id.* at ¶¶ 2, 3). Accordingly, it is reasonable to infer that Alaimo would be aware that the negotiations were ongoing. As for the remainder of paragraph 7, the Court finds that it is admissible. It merely states what Alaimo perceived at the time of the acquisition. Accordingly, the Court overrules Defendants' objection to paragraph 3.

Defendants move to strike the last sentence of paragraph 8, which states,

> During this time, he [Nelson] did not have access to any actual GM equipment to the best of my knowledge and never conducted a comprehensive review of GM products.  (*Id.* at ¶ 8).

This statement is within Alaimo's personal knowledge.  Alaimo was a consultant for BouMatic, he had attended the July 2, 2004, meeting in Belgium with Punch and Prolion representatives, and he had given Nelson brochures about GM's products.  (*Id.* at ¶¶ 2, 3, 8).  By virtue of Alaimo's position at BouMatic, it is reasonable for the Court to infer that he would be aware of whether Nelson had access to GM equipment.  Accordingly, the Court overrules this objection.

Defendants next objection is to the following statement in paragraph 11:

> . . . Prolion repeatedly had been cut off by suppliers before the acquisition.  (*Id.* at ¶ 11).

Defendants attempt to argue that Alaimo lacked the personal knowledge to make this statement.  At his deposition, however, Alaimo testified that ". . . the suppliers themselves would say that they had to cut off – Geminus, I think, was one of them, because I know I met personally with Geminus people.  And they told me they had cut off Prolion before.  And that's – because we asked them why they were doing this and they said that's the only way to get paid with Prolion."  (Alaimo Dep., Doc. 81 Tab 33 at 222).  The Court, therefore, finds that Alaimo's statement in paragraph 11 is within his personal knowledge, and, as such, the objection is overruled.

Defendants object to paragraphs 13, 14, 15, and 16 in their entirety.  Defendants contend that Alaimo does not have sufficient personal knowledge to make these statements.  Paragraphs 13, 14, 15, and 16 state as follows:

> In August and September 2004, I learned that many of GM's most widely-distributed products had major defects and did not function correctly.  These defective products were critical to the functioning of GM milking parlours, and included the LactiVac, the principal vacuum pump; the Pulsameter 2 milkmeter; the activity measurement system; the Condulac conductivity claw; the automatic kick-off device (the "Isolator XP"); and the software

used in the GM 3000 control system. (Alaimo Aff., Doc. 70 Ex. 10 at ¶ 13).

I learned that the activity measurement system, which was designed to identify the active cows in a herd (a high level of physical activity is an indication of fertility), was not functioning correctly and caused a high number of false positives. In my experience, a system with a low accuracy rate is not acceptable to customers, especially when other systems on the market, such as the BouMatic system used in the United States, can identify more than 75% of active cows in a herd with only 10-20% of those identifications being mistakes. BouMatic ultimately withdrew the activity measurement system from the market at the end of October 2004. (*Id.* at ¶ 14)

Another example is the Condulac, which had a claw piece that leaked and a malfunctioning electrical system. It is my understanding that this was a known problem, as the Condulac design had not changed in four years. Ultimately, we withdrew the Condulac from the market and issued a recall on the product. We also discontinued the LactiVac vacuum pump in May 2005 due to a design defect which I learned that Prolion had been investigating without success since early 2004, before the acquisition. (*Id.* at ¶ 15).

Due to these and other technical problems, many dealers refused to pay their bills to BouMatic, and in many cases demanded that BouMatic pay them for warranty-related expenses. Ultimately, BouMatic incurred significant warranty costs, research and development costs, and administrative expenses to address the defective product line. (*Id.* at ¶ 16).

These statements are all within Alaimo's personal knowledge. Alaimo worked as a consultant for BouMatic from February 2004 until December 2005, and he became its president in December 2005. (*Id.* at ¶ 2). Additionally, "[s]oon after the acquisition closed, [he] traveled to Belgium . . . to help with the transition and direct the consolidation of GM's operations into its facilities at Remicourt[.]" (*Id.* at ¶ 10). The Court may infer Alaimo's personal knowledge from his positions at BouMatic and the nature of his participation in the matters to which he swore. As such, Defendants objections to paragraphs 13, 14, 15, and 16 are overruled.

Defendants object to paragraph 17 on lack of *personal knowledge* and hearsay grounds.  Additionally, Defendants object to exhibit A of Alaimo's affidavit, which is discussed in paragraph 17, on hearsay grounds.  Paragraph 17 states as follows:

> Unsurprisingly, when BouMatic began attempting to collect receivables (as we were required to do under the APA), we encountered resistance from dealers who were dissatisfied with the poor product quality and Prolion's practice of shipping incomplete orders to dealers.  Attached to this affidavit as Exhibit A is a true and correct copy of an e-mail I received on March 28, 2005, in which Jan Derluyn requested help from Mr. van der Haegen (the COO of Prolion) and Mr. Maes because the dealer Wopereis refused to pay BouMatic invoices due to product quality problems with the Parlour Star dating back to before the acquisition.  Mr. Derluyn had already requested Prolion's help two months earlier in January 2005, but he did not receive any feedback or support from Prolion. . . . Mr. Derluyn wrote that Prolion's delays were "making the collection of receivables more difficult" . . . This email is representative of the general trend, where Prolion interfered with BouMatic's ability to collect receivables and service our customers because they were slow to address problems with dealers or even respond to our repeated requests for assistance.  (*Id.* at ¶ 17).

The Court overrules Defendants' personal knowledge objection to this statement for the same reasons it overruled Defendants' objections to paragraphs 13, 14, 15, and 16 above.  With respect to Defendants' hearsay objections to this statement and exhibit A, the Court notes that Plaintiffs admit that "rather than attaching the email Alaimo describes in paragraph 17, they inadvertently attached another email sent by Jan Derluyn on the same date[.]"   (Doc. 91 at 28 n. 8).  Accordingly, the Court will strike exhibit A, as well as the following portion of paragraph 17, from the record:

> Attached to this affidavit as Exhibit A is a true and correct copy of an e-mail I received on March 28, 2005, in which Jan Derluyn requested help from Mr. van der Haegen (the COO of Prolion) and Mr. Maes because the dealer Wopereis refused to pay BouMatic invoices due to product quality problems with the Parlour Star dating back to before the acquisition.  Mr. Derluyn had already requested Prolion's help two months earlier in January 2005, but

he did not receive any feedback or support from Prolion. . . Mr.
Derluyn wrote that Prolion's delays were "making the collection of
receivables more difficult" . . . This email is representative of[.]
(Alaimo Aff., Doc. 70 Ex. 10 at ¶ 17).

The Court will allow Alaimo to testify about the general trend based on his position with and

experience at BouMatic.

d.    <u>Alaimo's Deposition Testimony</u>

Defendants object to 151:19-25 of Alaimo's deposition testimony on lack of

personal knowledge grounds.  Alaimo states,

And then when there was key areas of negotiation to happen, a
number of times Guido and John Kotts would negotiate directly.
So the fact that Guido negotiated the deal directly, and then it turns
out the company was in serious financial difficulties, he didn't
disclose that to John Kotts.   He didn't disclose – in fact, he
disclosed the . . . (Alaimo Dep., Doc. 70 Ex. 11 at 151).

As Alaimo stated in his affidavit, he was not directly involved in the negotiations but was aware

of their status.  (Alaimo Aff., Doc. 70 Ex. 10 at ¶ 7).  Accordingly, the Court finds that Alaimo

lacks the personal knowledge to testify about the specifics of these negotiations and what

Dumarey did or did not disclose during them.   The Court, therefore, sustains Defendants

objection to and strikes this portion of Alaimo's deposition testimony from the record.

Defendants object to 155:11-21 of Alaimo's deposition testimony because it

includes self-serving, speculative, and conclusory statements that are not based on Alaimo's

personal knowledge.  Alaimo testified as follows:

Okay.   So Guido took the building in Bornel and put it under
another one of his company names.  But he took it out of the
Prolion company.  The same thing with the Emmeloord building.
And then he was renting these back to the companies and charging
them a very – I think a very high rent.

And there may have been some other real estate that I'm not aware
of, and some additional assets that I'm not aware of.  Those are

> just two examples that I'm aware of where prior to the sale he took
> away the assets of the company.  (Alaimo Dep., Doc. 70 Ex. 11 at
> 155).

The Court agrees with Defendants.  These alleged events would have taken place prior to any of the meetings or negotiations for the APA.  As such, there would be no way for Alaimo to have personal knowledge of such events, even by virtue of his position or experience at BouMatic after the APA.  Additionally, Alaimo does not provide any detailed information about these alleged events.  As such, his statements are speculative and conclusory, at best.  Thus, the Court sustains Defendants' objection to and strikes this testimony from the record.

Defendants object to several portions of Alaimo's deposition testimony about Dumarey's involvement in the APA negotiations.  First, Defendants object to 173:25 to 174:5 because it is a self-serving, conclusory statement without any concrete facts to support it.  Alaimo testified as follows:

> Well, starting from my meeting on July 2nd, it was obvious to me
> that Guido was micromanaging, Guido Dumarey was
> micromanaging the process within Prolion. So he was even
> determining what – what information we received or did not
> receive and was guiding the business. (*Id.* at 173-74).

Next, they object to 175:4-7 because it is a conclusory statement that is not based on personal knowledge.  Alaimo testified as follows:

> In other words, he was – he was micromanaging or – I don't mean
> that in a bad way, he was just very much involved in every detail.
> (*Id.* at 175).

Additionally, Defendants object to 175:17-21 because it consists of conclusory, self-serving statements that are completely speculative and are not based on Alaimo's personal knowledge.  Alaimo testified as follows:

> So beforehand he was intimately involved.  Afterwards he was
> intimately involved.  He negotiated the deal with John Kotts on the

telephone and also Bill Coe.  He had knowledge of the reps and
warranties.  (*Id.* at 175).

Defendants object to two statements from 175:22 to 179:15 because they are speculative,
conclusory, and not based on Alaimo's personal knowledge.  Alaimo testified as follows:

> . . . if you're going to even be on the board or even know about a
> business, you're going to know some general financial information
> about it.  (*Id.* at 176).

> . . . if you're the owner of the business or – then you couldn't help
> but know if everybody in the company knows.  (*Id.* at 177).

Lastly, Defendants object to Alaimo's statements that Prolion "was probably insolvent" and that
Prolion "basically sold an insolvent company" in 185:23 to 186:25.  These statements were all
made in response to the following question from defense counsel: "Now, what I want to know is:
How – what makes **you believe** that Punch and Dumarey knew that those representations and
warranties were not true?"  (*Id.* at ¶ 173) (emphasis added).  The Court will, therefore, allow
these statements because they are based on Alaimo's personal beliefs.  That his personal beliefs
are conclusory and speculative and are not based on facts in evidence, will go to the weight
accorded them, rather than their admissibility.  Accordingly, Defendants' objections to these
statements are overruled.

### 3.    Objections to Judge Stacy's August 27, 2008, Order

The documents sought by Plaintiffs consist of communications between Punch
and its counsel, Allen & Overy, during the APA negotiations and during the preparation for a
related arbitration proceeding.  The Court has reviewed and considered the parties' respective
arguments on this issue and finds that Defendants' objections should be sustained and Judge
Stacy's order vacated.  The Court, in this Opinion and Order, grants summary judgment in
Defendants' favor because Plaintiffs failed to establish the element of justifiable reliance in their

fraud claim.   Accordingly, the Court finds it unnecessary to address the substantive issues presented in Defendants' objections to Judge Stacy's order, as well as those in Plaintiffs' underlying motion to compel.

> B.    Fraud and Fraudulent Inducement Claims

Plaintiffs' fraud-based claims arise under Texas law.  To recover for fraud in Texas, a plaintiff must prove: "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury."  *Lane v. Halliburton*, 529 F.3d 548, 564 (5th Cir. 2008) (quoting *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001); citing *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex. 1977)).  These elements are also applicable to claims of fraudulent inducement.  *Lane*, 529 F.3d at 564 (citing *Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001); *RenCare, Ltd. v. United Med. Res., Inc.*, 180 S.W.3d 160, 166 (Tex. App.—San Antonio 2005)).

A plaintiff must act in reliance on a defendant's representations.  Common law fraud requires a plaintiff to show that he justifiably relied on the alleged misrepresentations. *Lewis v. Bank of America NA*, 343 F.3d 540, 546 (5th Cir. 2003) (citing *Ernst & Young, LLP v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)).  While the "justifiable reliance" element does not require a plaintiff to demonstrate reasonableness, a plaintiff "cannot recover if he blindly relies upon a misrepresentation of falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."  *Id.* at 546 (quoting *Field v. Mans*, 516 U.S. 59, 70-71 (1995)).  Moreover, a plaintiff may not justifiably rely on a

representation if "there are 'red flags' indicating such reliance is unwarranted." *Id.* at 546-47 (citing *In re Mercer*, 246 F.3d 391, 418 (5th Cir. 2001) (applying the "justifiable reliance" fraud standard in the federal bankruptcy setting)).

"Generally, reliance on representations made in a business or commercial transaction is not justified when the representation takes place in an adversarial context." *Coastal Bank SSB v. Chase Bank of Texas, N.A.*, 135 S.W.3d 840, 843 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (citing *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999)).  In determining whether a plaintiff has met the justifiable reliance element, the court must consider the nature of the relationship and the contract. *Id.* at 843 (citing *McCamish*, 991 S.W.2d at 794). "A party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *Id.* (citing *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962); *TCI Cablevision of Tex., Inc. v. S. Tex. Cable Television, Inc.*, 791 S.W.2d 269, 273 (Tex. App.—Corpus Christi 1990, writ denied)).

The Court finds that Plaintiffs did not act in justifiable reliance upon Dumarey's alleged misrepresentations. Dumarey made these alleged misrepresentations to Kotts in an adversarial context in anticipation of a commercial transaction between GM and BouMatic. During their June 2004 telephone conversation, Dumarey and Kotts came up with a skeleton of the transaction into which they wished to enter.  During this conversation, each man attempted to negotiate the strongest possible deal he could for his company.  Weeks later, Kotts' acquisition team met with Prolion's counsel to negotiate the written version of the APA.  Kotts' acquisition team was comprised of experienced, knowledgeable, and sophisticated businessmen, all of whom have had extensive experience in investigating a business before entering into a transaction with

it.  Because Kotts' acquisition team and Prolion's counsel were involved in an arms-length transaction, they were required to exercise ordinary care to protect their own interests and not merely to rely on the honesty and integrity of the other party.

Plaintiffs had access to public information concerning Prolion's financial health. Because it was a publicly traded company, Prolion's financial statements were accessible to the public.  Furthermore, Prolion's January 2004 press release indicates that it was in poor financial health and was having liquidity issues and supply chain problems.  In addition to the public information available to Plaintiffs, Kotts and the acquisition team also had the information provided to them by Alaimo and Pochard.  Although Alaimo advised Kotts that the acquisition of GM was a very promising and attractive transaction, Pochard painted a bleaker picture involving problems with new the management, dealers, dealer agreements, and one of the pieces of electronic equipment GM manufactures.  Kotts, therefore, should have had reason to doubt the accuracy and truthfulness of Dumarey's statements.

Furthermore, the Court can simply not find that Plaintiffs justifiably relied upon Dumarey's alleged representations when they failed to conduct any due diligence whatsoever. Plaintiffs initially included a due diligence provision in the MOU.  However, because of timing issues, Plaintiffs acknowledged that they either had to forego due diligence or delay the transaction closing date scheduled for mid-July.  Prolion was insistent upon a mid-July closing date because they had a shareholder meeting set for July 15, 2004.  Accordingly, Plaintiffs decided to enter into the APA without conducting any due diligence, despite the fact that, in past transactions, they have always investigated the truth of what the seller tells them by performing due diligence.  Defendants did not force Plaintiffs to enter into the APA.  Plaintiffs always had the option of walking away from the transaction.  However, they chose not to do so.

Furthermore, the fact that Plaintiffs "relied" upon the alleged misrepresentations by including the sum and substance of them in the representations and warranties section of the APA does not, by default, mean that such "reliance" was justifiable.  It simply means that if the representations turned out to be false, Plaintiffs could assert a breach of contract claim.

        C.      <u>Civil Conspiracy Claim</u>

Civil conspiracy is a derivative tort under Texas law.  *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007) (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).  "If a plaintiff fails to state a separate underlying claim on which the court may grant relief, then a claim for civil conspiracy necessarily fails."  *Id.* at 640 (citing *Tilton*, 925 S.W.2d at 681).  Because Plaintiffs in the instant case cannot prevail on their underlying tort claims of fraud and fraudulent inducement, their claim for civil conspiracy inevitably fails.

IV.               <u>Conclusion</u>

Accordingly, the Court hereby ORDERS as follows:

(1) Defendants' summary judgment motion (Doc. 64) is GRANTED;

(2) Plaintiffs' motion to strike Defendants' summary judgment evidence (Doc. 71) is GRANTED-IN-PART and DENIED-IN-PART;

(3) Defendants' motion to strike Plaintiffs' summary judgment evidence (Doc. 79) is GRANTED-IN-PART and DENIED-IN-PART;

(4) Defendants' motion for leave to file supplemental material (Doc. 80) is GRANTED;

(5) Plaintiffs' motion for leave to file a surreply (Doc. 93) is GRANTED; and

(6) Defendants' objections to Judge Stacy's August 27, 2008, Order (Doc. 94) are SUSTAINED, and her Order is VACATED.

SIGNED at Houston, Texas, this 31st day of March, 2009.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE